**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

**CIVIL NO. 3:07CV313-03-T
(3:02CR156-1-T)**

| | | |
|---|---|---|
| **DEBBIE ZIMMERMAN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM AND** |
| | ) | **ORDER** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Petitioner's motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 and supporting memorandum filed August 6, 2007; Respondent's answer and motion for summary judgment filed December 9, 2007; Petitioner's response thereto filed February 21, 2008; and Petitioner's "Affidavit in Support of § 2255; Opposition to Government's Motion for Summary Judgment; Memorandum of Law, and Rebuttal of the Government's Response and Motion for Summary Judgment" filed February 29, 2008.

## I. FACTUAL AND PROCEDURAL HISTORY

On September 13, 2002, Petitioner and six co-defendants were charged in a 66-count superseding bill of indictment with a wide ranging scheme to defraud investors in the secondary mortgage market by creating and selling bogus mortgage loans. **Superseding Bill of Indictment, filed September 13, 2002.** Specifically, Count One alleged that Zimmerman conspired with her co-defendants to defraud the Federal National Mortgage Association ("Fannie Mae") by selling bogus mortgage notes, to defraud the United States by pooling fictitious mortgage notes into securities issued by the Government National Mortgage Association ("Ginnie Mae") and to launder the proceeds of their fraud in violation of 18 U.S.C. § 371. Counts Two through Ten charged Zimmerman with using interstate wire transmissions to sell certain false mortgage notes to Fannie Mae and aiding and abetting that offense, in violation of 18 U.S.C. §§ 1343 and 2. In Counts 42, 43, 44, 47, 51 and 52, Zimmerman was charged with making, passing and uttering counterfeit mortgage notes in violation of 18 U.S.C. § 1010. *Id.*

Zimmerman and appointed counsel, Danielle Bess Obiorah,[1] proceeded to trial on November 12, 2002. After a nine-day trial, the jury found Zimmerman guilty on all objects of the conspiracy of Count One; not guilty on Counts Two through Ten; not guilty on Counts 42 through 44; and guilty of Counts 47, 51 and 52. **Jury Verdict, filed November 22, 2002**.

Zimmerman's presentence report calculated her total offense level as 33 with a criminal history category I, resulting in a sentencing range of 135-168 months. However, because the statutory maximum sentence of imprisonment for all counts of conviction was less than the minimum of the Guidelines range, Petitioner's term of imprisonment was reduced to 132 months. On December 2, 2003, Petitioner was sentenced to 132 months imprisonment. **Judgment in a Criminal Case, filed December 22, 2003.**

Petitioner filed a timely notice of appeal on December 29, 2003. Petitioner's appeal was consolidated by the Fourth Circuit Court of Appeals with that of her husband and co-defendant Paul Zimmerman and co-defendants, Macy and James McLean. **Fourth Circuit Order, filed January 14, 2004**.

---

[1] Obiorah was appointed to represent Zimmerman at trial and on her direct appeals. **Exhibit 1, Affidavit of Danielle B. Obiorah, *attached to* Respondent's Answer, filed December 9, 2007.**

On September 2, 2004, the appellants filed a consolidated brief that included a common statement of the case as well as their individual statements of facts.  Petitioner's statement discussed her role as construction coordinator for First Beneficial Homes ("FBH") and how she and Paul Zimmerman relied on James McLean's explanation of the "investor program."  ***See* Respondent's Answer, filed December 9, 2007, at 6-7.**  The Zimmermans argued they had no prior experience in mortgage lending and believed the program proposed by James McLean was legal.  *Id*. **at 7**.  They became "investors" and recruited friends and family to "invest."  *Id*.  Petitioner denied any "interactions" with Fannie Mae or Ginnie Mae or any knowledge as to how "investment papers" were being used after she submitted them to James McLean.  *Id*.

On May 2, 2005, the Fourth Circuit upheld the jury's verdicts as to all appellants, including Petitioner, but vacated their sentences and remanded the cases for resentencing in light of the Supreme Court's decision in *United States v. Booker,* 543 U.S. 220 (2005).  ***United States v. McLean, 131 F. App'x 34, 41 (4th Cir. 2005)***.  The Court specifically rejected Petitioner's argument that this Court's "willful blindness" instruction was improper or that the evidence at trial failed to prove beyond a reasonable

doubt that Petitioner had the requisite guilty knowledge and intent. *Id.* **at**

**39**.  With respect to Petitioner's sufficiency of the evidence arguments, the

Fourth Circuit observed:

> Evidence of [the Zimmermans'] actual knowledge of the scheme to defraud the government included Paul Zimmerman's testimony that he and his wife heard James McLean say that FBMC was "HUD-supported" and that he understood the mortgage notes that they were having executed bore an FHA number and other FHA markings.  It also included the testimony of Eric Brown, who explored the possibility of financing a family-owned real estate venture through FBMC in the early part of 2000.  Upon arriving at FBMC for what Brown believed was a preliminary meeting, Debbie Zimmerman presented him with mortgage documents bearing his name and the names of his parents as the purported debtors.  Brown testified that Debbie told him he had to sign the notes immediately so the documents could be sent to HUD for processing.  When Brown balked at signing and asked if his attorney could review the documents, James McLean explained, with Debbie Zimmerman present, that the scheme was "legal, but . . . not really legal."  Paul Zimmerman explained to Brown that if they signed, they would have no obligation under the notes, and that FBMC was obtaining its financing through some federal agency.  Debbie Zimmerman's brother testified that she approached him, but that he objected when he learned that the note would be used to obtain funds from Fannie Mae.

*Id*.

As noted above, the Fourth Circuit found this Court erred by

sentencing Petitioner under the mandatory Federal Sentencing Guidelines

and remanded the case for a new sentencing hearing consistent with the

Supreme Court's holing in *Booker*. The Court specifically noted that it had considered each of the defendant's arguments with respect to the application of the Guidelines and found no error. On rehearing, this Court was to consider the previously determined Guideline range and other relevant factors under 18 U.S.C. § 3553(a). *Id.* **at 41**.

Petitioner appeared with appointed counsel Obiorah before the Court for resentencing on August 9, 2005. Pursuant to the Fourth Circuit's mandate, the Court considered the previously determined Guideline ranges for each defendant as well as other factors under 18 U.S.C. § 3553(a). **Resentencing Transcript, filed December 28, 2005, at 16.** Petitioner's counsel argued for a variance from the Guidelines using the sentencing factors under 18 U.S.C. § 3553(a)(2), including that Petitioner had successfully rehabilitated herself in prison, had overcome adversities in her life before and was the adopted mother of a son whom she and her husband took in after a relative could no longer care for him. *Id.* **at 4-5.** She also noted potential disparities between her sentence and the sentences of others convicted in the same scheme. *Id.* **at 6.** Petitioner's counsel also argued that the Court was no longer required to impose

consecutive sentences in order to achieve the minimum Guidelines sentence. *Id.* **at 11.**

Counsel's arguments on behalf of Petitioner persuaded the Court to vary from the Sentencing Guidelines and impose a sentence of 120 months imprisonment, instead of the prior sentence of 132 months. **Amended Judgment in a Criminal Case, filed August 25, 2005**.

Petitioner appealed the Court's amended sentence, arguing that the amended sentence should be vacated and remanded because 10 years imprisonment for Petitioner's offenses was "unreasonable." The Fourth Circuit affirmed Petitioner's sentence, specifically finding that the Court's sentence was procedurally and substantively reasonable. ***United States v. McLean,* 192 F. App'x 234, 236 (4th Cir. 2007).** Petitioner filed a petition for a writ of *certiorari* with the U.S. Supreme Court; the petition was denied on June 29, 2007. ***Zimmerman v. United States*, 551 U.S. 1166 (2007)**.

Petitioner's § 2255 motion alleges 13 errors that deprived her of a fair trial and that her counsel was ineffective for failing to raise these issues at trial or on direct appeal. These issues, as stated by Petitioner, include: defects in the indictment (constructive amendment, duplicity and

multiplicity); insufficiency of the evidence; prosecutorial misconduct; and multiple claims of ineffective assistance of trial and appellate counsel. However, all grounds are couched in terms if ineffective assistance of counsel. Petitioner's ground # 13 alleging ineffective assistance of counsel, re-alleges the prior grounds in addition to other perceived errors by counsel. Petitioner frames all her claims as ineffective assistance of counsel claims presumably because most of her claims would have been barred because they were not raised on direct appeal. Therefore, this Court will focus its analysis on Petitioner's claims in the context of ineffective assistance of counsel.

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant summary judgment when the pleadings and other relevant documents reveal that "there is not genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." ***See, e.g.*** ***Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Matsushita Elec. Indus.***

***Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990).**

A genuine issues exists only if "the evidence is such that a reasonable jury could return a verdict for the on-moving party." ***Anderson*, 477 U.S. at 248.** However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment." ***Id.* at 249-50.**

## III.  ANALYSIS

Petitioner alleges numerous instances in which her attorney deprived her of her constitutional right to the effective assistance of counsel. When alleging a claim of ineffective assistance of counsel, a petitioner must show that counsel's performance was constitutionally deficient to the extent it fell below an objective standard of reasonableness, and that she was prejudiced thereby. ***Strickland v. Washington*, 466 U.S. 668, 687-91 (1984).** In making this determination, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. ***Id.* at 689**; ***see also Fields v. Attorney Gen'l. of Md.*, 956 F.2d 1290, 1297-99 (4th Cir. 1985)**; ***Hutchins v. Garrison*, 724 F.2d 1425,**

**1430-31 (4th Cir. 1983)**; *Marzullo v. Maryland*, **561 F.2d 540 (4th Cir. 1977)**.  It should be noted that "effective representation is not synonymous with errorless representation," and "the Constitution entitles a criminal defendant to a fair trial, not a perfect one."  *Springer v. Collins,* **586 F.2d 329, 332 (4th Cir. 1978)**; *Delaware v. Van Arsdall*, **475 U.S. 673, 681 (1986).**

To demonstrate prejudice, Petitioner must show a probability that the alleged errors worked to her "'*actual* and substantial disadvantage, infecting [her] trial with error of constitutional dimensions.'"  *Murray v. Carrier*, **477 U.S. 478, 494 (1986) (quoting** *United States v. Frady*, **456 U.S. 152, 170 (1982)).**  Under these circumstances, Petitioner "bears the burden of proving *Strickland* prejudice."  *Fields*, **956 F.2d at 1297 (citing** *Hutchins*, **724 F.2d at 1430-31).**  Therefore, if Petitioner fails to meet this burden, a "reviewing court need not consider the performance prong."  *Id.* **at 1290 (citing** *Strickland*, **466 U.S. at 697)**.


**A. Constructive Amendment**

Petitioner's first claims concerns her counsel's failure to object at trial and on appeal to what Petitioner perceives as "constructive amendment" to

the superseding indictment.  In her affidavit, Petitioner's counsel states that she did not raise these objections because they are not supported by law. **Exhibit 1, Affidavit of Danielle B. Obiorah,** *attached to* **Respondent's Answer, filed December 9, 2007, ¶ 1.**

"Constructive amendment" occurs when the government, through its presentation of evidence and/or arguments, or the court, through its instructions to the jury, broadens the bases for conviction beyond those charged in the indictment.  ***United States v. Randall,*** **171 F.3d 195, 203 (4ᵗʰ Cir. 1999)**.  "A constructive amendment is a fatal variance because the indictment is altered 'to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment.'" ***Id.*** **(quoting *United States v. Schnabel*, 939 F.2d 197, 203 (4ᵗʰ Cir. 1991)).**  However, not all differences between an indictment and proof at trial rise to the level of a "fatal variance" or constructive amendment.  ***Id***.  When different evidence is presented at trial than specified in the indictment, but such evidence does not otherwise alter the crime charged in the indictment, a mere variance occurs.  ***Id***.  A mere variance does not violate a defendant's constitutional rights unless it prejudices the defendant, either hindering the preparation of her defense,

or by surprising her at trial, or exposing her to the risk of a second prosecution for the same offense. *Id*.

Petitioner contends that this Court impermissibly "broadened" the offense charged in the indictment through instructions on "aiding and abetting," "knowingly and intentionally," and "willful blindness," and the Government presented evidence beyond that noticed in the indictment. Petitioner contends that the Court amended Counts 47, 51 and 52, charging that she made and passed false mortgage notes, when it instructed the jury on aiding and abetting. Petitioner claims that this expanded the indictment because aiding and abetting did not appear in these counts.

First, a review of the superseding indictment reveals that Counts 47, 51 and 52 were preceded and followed by specific citation to 18 U.S.C. § 2,  the aiding and abetting statute. **Superseding Indictment, at 21.** Therefore, Petitioner cannot claim that she was surprised or prejudiced by the Court's instruction on aiding and abetting. Next, aiding and abetting is implied in every federal indictment of a substantive offense. ***See United States v. Armstrong*, 909 F.2d 1238, 1241 (9th Cir. 1990).** Indeed, "'in keeping with the provisions of [18 U.S.C.] § 2, it has long been held that an

indictment need not specifically charge 'aiding and abetting' or 'causing' the commission of an offense against the United States, in order to support a jury verdict based on the finding of either.'" *Id.* **(quoting *United States v. Lester*, 363 F.2d 68, 72 (6th Cir. 1966))**.

Next, the Court's instruction on "knowing," "willful blindness" and "specific intent" did not "broaden" the charged offenses just because those words were not alleged in the indictment.  Indeed, each of the offenses that Petitioner now claims were constructively amended tracked the language of the statute charged.  Counts 47, 51 and 52 used the words "with the intent that false mortgage notes be offered to, or accepted by, HUD for insurance" and they were made, passed or uttered by the defendants "knowing that they were materially false,"  **Superseding Indictment, supra.**  The Court's instructions on these offenses necessarily included the words "knowing," "intentional," and "material."  Similarly, the law does not require that the words "willful blindness" appear in the charged offenses before the Court may instruct on how this legal doctrine might apply to the facts of this case.  Indeed, in this case, the Fourth Circuit specifically held that the willful blindness instruction was proper.  ***McLean,* 131 F. App'x at 38-39.**

Petitioner has not established that the indictment was constructively amended or that counsel was deficient in failing to raise this argument with respect to the Court's instructions at trial or on appeal. Therefore, this ineffective assistance of counsel claim must fail.

Petitioner also argues that the Government's evidence broadened the charged offenses. Petitioner appears to argue that any evidence deviating from the specific allegations in the charged offense is not permitted. Petitioner relies on *Stirone v. United States,* 361 U.S. 212, 218-219 (1960), in support of her claim. In *Stirone*, the Government charged the defendant with violating the Hobbs Act by misusing his position as a labor union official to obstruct interstate commerce, specifically the movement of sand used in mixing concrete. *Id.* **at 214.** At trial, the Government was permitted to introduce into evidence that the defendant's activities affected interstate commerce because the concrete was used to construct buildings in which steel was manufactured for interstate shipment. *Id.* The district court instructed the jury that they could find the defendant guilty if they found either basis for the interstate element – *i.e.*, the interstate movement of sand or the use of concrete to build steel plants. *Id.* In reversing the defendants convictions, the Supreme Court

held that the indictment could not "fairly be read" as charging interference with interstate commerce through the movement of steel. *Id.* **at 217***.*

Petitioner's case here is distinguishable from *Stirone*. Here, the superseding indictment charged a broad scheme to defraud Fannie Mae, Ginnie Mae and Branch Banking & Trust Co. ("BB&T"), as well as investors in the secondary mortgage market. In Counts 37 through 52, the indictment charged that the defendants made and passed false statements and counterfeit notes knowing they would be insured by HUD. **Superseding Indictment, ¶¶ 50-52.** However, the introductory paragraphs of the superseding indictment as well as Count One (overarching conspiracy allegation) are specifically incorporated into Counts 37 through 52 by reference. *Id.* **¶ 50**. Count One charged a broad scheme to defraud Fannie Mae, Ginnie Mae and BB&T, as well as investors in the secondary mortgage market. Paragraphs 16 and 23 through 34 of Count One specifically allege that the defendants made and sold false mortgage notes to Ginnie Mae in excess of $21 million. Contrary to Petitioner's constructive amendment argument, the indictment did allege that she and her co-defendants made false mortgage notes and assignments. Unlike *Stirone*, the Government's evidence at this trial did

not introduce a new theory with respect to an element of the charged offense.  Instead, the evidence offered at trial tracked the indictment and proved Petitioner's guilt on the charged offense beyond a reasonable doubt.  ***See United States v. Ward,* 486 F.3d 1212, 1228 (11th Cir. 2007) (indictment alleging mail fraud and wire fraud was not constructively amended by incorporation of a charged conspiracy by reference.)**

Petitioner also alleges that the indictment was constructively amended by the Court's admission of evidence of Ginnie Mae's loss which was improper since loss is not an element of 18 U.S.C. § 1010, citing *United States v. Farrington,* 389 F.2d 357 (6th Cir. 1968), to establish that the admission of this evidence was improper.

In the instant case, the Government did not introduce evidence of how much money Ginnie Mae lost due to First Beneficial Mortgage Corporation's ("FBMC") fraud.  Instead, the Government offered evidence of how much money Ginnie Mae has reimbursed Market Street – the loan servicer who took over FBMC's loans.  The trial testimony concerned loans for which Market Street could not collect past due payments or find collateral to foreclose.  **Trial Transcript, Vol. IV, filed February 18, 2004, at 1084-91**.  This evidence was relevant to rebut the defendants' claim that

they did not knowingly commit fraud, but instead made manufactured home loans which were authorized by Ginnie Mae. The testimony was also offered to prove that the loans affected HUD. Market Street's representative testified that it could not collect on most FBMC loans because it could not locate many of the borrowers named on the loans issued by FBMC and found "bad addresses" when they tried to foreclose on the collateral listed on FBMC loan documents. *Id.* **at 1091-93**. Moreover, Market Street's testimony that Ginnie Mae paid out over $23 million by the time of trial was relevant to the charged conspiracy and money laundering counts.

In *Farrington*, the defendant was charged only with presenting HUD with false completion certificates for home repairs, for which loss amount was not relevant. Therefore, *Farrington* is distinguishable from the instant case and does not support Petitioner's claim that her counsel was ineffective for not objecting to the Court allowing the alleged improper admission of evidence regarding loss. Moreover, Petitioner has not established that the evidence at trial improperly "broadened" or constructively amended the charged offenses nor that her counsel was

deficient for failing to object to the admission of evidence regarding loss as is required under *Strickland*.

## B. Defective Indictment

Petitioner contends that the indictment was defective and counsel was ineffective for failing to object at trial and on appeal on this issue. Specifically, Petitioner contends that Counts 47, 51 and 52 are defective because they fail to include the words "aiding and abetting" and "knowingly and intentionally."

It seems Petitioner believes that the quoted words above must be stated in the indictment because the Court used them in its charge to the jury. Petitioner misunderstands the law.

An indictment must contain the elements of the offense charged and fairly inform the defendant of the charge against her and must enable her to plead an acquittal or conviction in bar of future prosecutions for the same offenses. ***Hamling v. United States,* 418 U.S. 87, 117 (1974).** It is generally sufficient that an indictment set forth the offense in the words of the statute itself as long as those words are unambiguous and set forth all of the elements of the offense charged. ***Id*.

In this case, each of the Court's instructions challenged by Petitioner tracks the language of the statute.  Indeed, Counts 37 through 52 allege that the named defendants made and passed counterfeit mortgage notes "knowing them to be false" and "counterfeited."  While the Court's instructions may have included different words to explain the required scienter to the jury, it does not mean the indictment was defective.  The indictment in this case passes constitutional muster in that it was sufficient to put the defendants on notice of the offense charged and to bar any future prosecutions from the same crimes.

Petitioner also complains that Counts 37 through 52 were amended or defective because they did not contain the words "aided and abetted," even though the statutory citation to 18 U.S.C. § 2 was included in the body of these counts.  As stated *supra*, there was no error in the Court's instruction on an aiding and abetting theory of criminal liability, since "[t]he federal aiding and abetting statute is 'considered embodied in full in every federal indictment.'"  ***United States v. Takizal***, **940 F.2d 654 (table), 1991 WL 150671, at \*3 (4th Cir. 1991) (quoting *United States v. Michaels*, 796 F.2d 1112, 1118 (9th Cir. 1986)).**

Therefore, Petitioner has not established that the indictment was defective nor that her counsel was deficient for failing to raise this claim at trial or on appeal. Moreover, even if this Court were to assume deficiency, Petitioner has not established prejudice as each count in the indictment contained a reference to the statute charged in its caption and in the body of the charge itself. *See United States v. Roberts,* **296 F.2d 198, 200 (4th Cir. 1961)**.

**C. Multiplicious Indictment**

Petitioner contends that her indictment was multiplicious and that her counsel was ineffective for failing to object to Counts 51 and 52 on such grounds. Petitioner contends Counts 51 and 52 are multiplicious because the counterfeit mortgage notes alleged separately in each of these counts were sold to Ginnie Mae investors in the same pools.

Multiplicity is defined as "charging a single offense in more than one count in an indictment." *United States v. Lemons*, **941 F.2d 309, 317 (5th Cir. 1991)**. In *Lemons*, the defendant claimed that a series of transactions charged under separate counts of bank fraud in violation of 18 U.S.C. § 1344 constituted a single scheme to defraud. The court agreed with the

defendant because the bank fraud statute, unlike the mail and wire fraud statutes, punishes "execution" of a scheme to defraud, whereas the mail and wire fraud statutes expressly punishes separate acts in execution of a scheme to defraud. *Id.* **at 318**. Thus, each separate use of wire communications constitutes a separate offense even if the defendant is engaged in a single scheme to defraud. ***United States v. Butler*, 704 F. Supp. 1338, 1343 (E.D. Va. 1989) (citing *United States v. Muni*, 668 F.2d 87 (2d Cir. 1981); *United States v. Calvert*, 523 F.2d 895 (8th Cir. 1975), *aff'd* 905 F.2d 1532 (4th Cir. 1990); *United States v. Locklear*, 829 F.2d 1341, 1318-19 (4th Cir. 1987)).**

Here, Counts 51 and 52 charge the defendants made, passed and uttered different counterfeit mortgage notes. Title 18 U.S.C. § 1010 punishes "whoever . . . makes, passes [or] utters . . . any statement, knowing the same to be false . . .or counterfeits any instrument . . . or utters, publishes, or passes as true any instrument, paper, or documents, knowing it to have been . . . counterfeited." Each of Counts 51 and 52 then specifically describes different promissory notes that were "made, passed [or] uttered" on different occasions. Like the wire fraud statute, it is clear from the statute that Congress intended that the making of each false or

counterfeit document would constitute a separate violation of the law. **See**

**Bins v. United States, 331 F.2d 390, 392 (5th Cir. 1964) ("The essence**

**of a violation of [§ 1010] is the uttering and publishing of false**

**documents with intent to influence [HUD].").**

Petitioner also alleges that Counts 51 and 52 were multiplicious for

sentencing – the remedy of which is to merge the counts and impose one

sentence. However, the indictment and evidence at trial showed that

Counts 51 and 52 arise from two separate counterfeit mortgages, with two

different fictitious borrowers' names and signatures, two different

addresses, and two different amounts – one for $135,000 and another for

$134,000. The fact that these two mortgages were made on the same day

or placed in the same Ginnie Mae pool means only that with respect to

these counterfeit notes, the Zimmermans and McLeans committed two

crimes on the same day.

At trial, the Government established that Petitioner and her husband

submitted the names to Macy McLean. Mrs. McLean then directed her

assistant, Shandra Wright, to type the fraudulent notes from lists of

properties that she and the Zimmermans provided. **Trial Transcript, Vol.**

**II, filed February 18, 2004, at 497**. The notes were counterfeit because

the names on the loans were not the names of true borrowers and the properties listed were not residences that would be occupied by the named borrowers.  The counterfeit notes were then returned to the Zimmermans, who brought them to the persons named as borrowers for their signatures.  Petitioner "passed" the notes by bringing them to Macy McLean after the false borrowers signed them.  Mrs. McLean further passed the notes by forwarding them to the document custodian at BB&T.

At trial, the Government offered into evidence copies of the counterfeit notes charged in Counts 51 and 52.  The note underlying Count 51 was property located at 3310 North Rocky River Road in Monroe, North Carolina, and was signed by a person known to the grand jury as K.D. in the amount of $135,000.  *See* **Exhibit 17, Government Trial Exhibit 201(c),** *attached to* **Respondent's Answer**.  The note underlying Count 52 was for property located at 3200 Polk and White Road in Monroe, North Carolina, and was signed by a person known to the grand jury as C.M. in the amount of $134,000.  *See* **Exhibit 18, Government Trial Ex. 201(d),** *attached to* **Respondent's Answer.**

Zimmerman made, passed and uttered counterfeit notes in Counts 51 and 52 and there is no legal or factual basis to support her claim that

any of the counts in the indictment were multiplicious or that the

consecutive sentences imposed violated the double jeopardy clause of the

Constitution.  Therefore, her claim that her counsel was ineffective for

failing to raise this issue at trial and on appeal must fail.


**D. Duplicitous Indictment**

Next, Petitioner contends that the indictment was duplicitous and that

her counsel was ineffective for failing to challenge various counts in the

indictment on this basis.   "Duplicity is the 'joining of two or more offenses

in a single count.'"  ***United States v. Toliver*, 972 F. Supp. 1030, 1039**

**(W.D. Va. 1997) (quoting *United States v. Marshall*, 75 F.3d 1097, 1111**

**(7th Cir. 1996)).**  Where a statute provides more than one means of

committing the same offense, the policy against duplicity does not prohibit

the Government from charging more than one of those means in the

conjunctive, in one count.  ***United States v. Griffin*, 502 U.S. 46, 50-51**

**(1991); *see also*, Fed. R. Crim. P. 7(c) (a single count may allege that a**

**defendant committed an offense by one or more specified means).**

Further, the policy against duplicity does not prevent an indictment from

alleging more than one act in a single count if the acts are part of a

continuous course of conduct. ***See United States v. Smith*, 373 F.3d 561, 563-64 (4th Cir. 2004).**

Counts 47, 51 and 52 allege the making and passing of false statements and counterfeit mortgage notes to HUD in violation of 18 U.S.C. § 1010. Section 1010 is comprised of several operative clauses in the disjunctive. ***See United States v. Jenkins*, 785 F.2d 1387, 1391 (9th Cir. 1986).** It is a regular and permitted practice for prosecutors to charge conjunctively, in one count, the various means of committing a statutory offense, which means are listed disjunctively. ***Griffin v. United States*, 502 U.S. 46, 51 (1991)**. Each of Counts 47, 51 and 52 allege three different ways in which the defendants violated § 1010 by making, passing or uttering a separate mortgage note. The three different means track the language of the statute and are alleged in the indictment in the conjunctive. The test for determining whether a count alleges different means of violating the same statute or several offenses is to examine whether identical evidence will support each of the different means. ***Bins*, 331 F.2d at 393**. In *Bins*, the indictment charged in a single count that the defendant violated § 1010 by making false statements in three different documents, dated on different days. The court found that these counts to

be duplicitous because they obviously require proof of different facts – *i.e.*,

that different forms were submitted on different dates.  However, the three

different means of violating § 1010 alleged in the instant case require proof

of the same facts – *i.e.*, that the single mortgage note described in each of

Counts 47, 51 and 52 was false when it was made, passed, uttered or

counterfeited on a single date.

There is no legal or factual basis to support Petitioner's claim that

any of the counts in the indictment were duplicitous.  Therefore, Petitioner

cannot satisfy either prong of the *Strickland* test.  Petitioner's claim that her

counsel was ineffective for failing to raise this issue at trial and on appeal

must fail.

## E. Insufficiency of the Evidence Claims

Petitioner contends that the evidence presented at her trial was

insufficient to prove that she acted "knowingly and wilfully" with the intent

required to conspire under 18 U.S.C. § 371 or to make, pass and utter

counterfeit mortgages under 18 U.S.C. § 1010.  However, her trial counsel

raised these same arguments at trial and on appeal to the Fourth Circuit.

In her brief to the Fourth Circuit, the Zimmermans[2] alleged that this Court

erred in denying their motion for judgment of acquittal for three reasons:

> (1) the Government failed to present a prima facie case
> because it did not provide sufficient proof of [their] intent; (2)
> the Government failed to present evidence sufficient to refute
> [their] "good faith" defense beyond a reasonable doubt; and (3)
> the Government failed to provide evidence of "willful"
> blindness/deliberate ignorance.

**Appellants' Brief, at 32.**  As the Fourth Circuit observed in its opinion

denying Petitioner's direct appeal,

> Macy McLean and both Zimmermans claim they acted in good
> faith and lacked the requisite guilty knowledge to support a
> conviction on any of the charges against them.  However, while
> there is clear evidence that would permit the jury to find actual
> knowledge, the evidence also supports the conclusion that if
> they were not specifically aware that they were defrauding the
> government they were willfully blind to that fact.

***McLean,* 131 F. App'x at 39.**  Additionally, the appellate court stated that

"[h]aving carefully reviewed the record of evidence in the light most

favorable to the government, we conclude that there was ample evidence

for a reasonable trier of fact to have found defendants guilty beyond a

---

[2] Zimmerman fully joined in the arguments of her husband and co-defendant on the issue of sufficiency of the evidence.

reasonable doubt on each count of conviction." *Id.* **at 41.** With respect to willful blindness, the Court found:

> [T]here was evidence from which a jury could have inferred that Macy McLean and the Zimmermans were aware or closed their eyes to the fact that mortgage notes contained false information; that no houses were being sold in connection with these loans; and that "investors" were receiving money for signing and they were not going to be obligated under the note. This evidence would support an inference of deliberate ignorance.

*Id.* **at 39-40**.

Once an issue has been fully considered by an appellate court, the defendant cannot re-litigate that issue before this Court in a motion brought under § 2255.[3] *See Boechenhaupt v. United States*, **537 F.2d 1182, 1183 (4th Cir. 1976).** Petitioner's sufficiency of the evidence claim was raised on appeal; therefore, she is foreclosed from re-litigating that issue before this Court.

---

[3] Even if Zimmerman had not raised "sufficiency" on direct appeal – which she did by joining her husband's claims – she would be barred from raising them in this collateral attack in any event. Where a petitioner in a § 2255 proceeding attempts to raise claims that could have been raised on direct appeal, the district court's review of such issues is barred absent a showing of cause and prejudice or actual innocence. *Bousley v. United States*, **523 U.S. 614 (1998);** *United States v. Frady*, **456 U.S. 152, 170 (1982).**

## F. Prosecutorial Misconduct

Next, Petitioner contends that her counsel was ineffective for failing to raise the issue of prosecutorial misconduct at trial. Petitioner contends the prosecutor suborned perjured testimony from James Harvery Beatty,[4] Sharon Abrams, Richiedean Gess, Sandra Dixon and Eric Brown. She also alleges a *Brady*[5] violation with respect to the Government's alleged failure to produce FBMC's HUD application and approval to issue Title I manufactured home loan guarantees. Finally, she argues that the prosecutors made certain misleading statements in response to her direct appeal to the Fourth Circuit.

In order to establish a claim of prosecutorial misconduct, a defendant must show that the alleged "conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." ***United States v. Scheetz*, 293 F.3d 175, 185 (4th Cir. 2002)**. Additionally, there is a two-prong test for reversible prosecutorial misconduct. First the defendant

---

[4] Petitioner alleges that Mr. Beatty perjured himself in the grand jury when he stated that he made mortgage payments on an FBMC home loan when other FBMC employees told the FBI that Beatty had not made any payments on his loan. Defense counsel was provided with a transcript in accordance with 18 U.S.C. § 3500. Since the issue at trial was that the "loans" were bogus, whether or not Beatty made any payments was not material.

[5] ***Brady v. Maryland*, 373 U.S. 83 (1963).**

must show that the prosecutor's remarks or conduct were improper.

Second, the defendant must establish that such remarks or conduct

prejudicially affected her substantial rights so to deprive her of a fair trial.

*Id*. "A defendant seeking to vacate a conviction based on perjured

testimony must show that the testimony was, indeed, perjured." ***United***

***States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987).**

Here, Petitioner has not established that any of the Government's

witnesses provided false testimony.  At most, she has shown minor

inconsistencies between the witnesses' trial testimony and/or their prior

statements to law enforcement.  "Mere inconsistencies in testimony by

government witnesses do not establish the government's knowing use of

false testimony."  *Id.* **(citing** *Overton v. United States***, 450 F.2d 919, 920**

**(5th Cir. 1971).**   Petitioner has not established that any of these witnesses

provided perjured testimony.  Therefore, she has also not established that

her counsel was ineffective for failing to raise this claim.

Petitioner also claims that her counsel was ineffective for failing to

raise a *Brady* claim.  Specifically, Petitioner contends that the prosecutor

acted improperly by failing to "bring forth" FBMC's application and letter for

Title I approval.

In order to establish a *Brady* claim, a defendant must show that: (1) the evidence must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the Government; and (3) it must be material.  **Spicer v. Roxbury Corr. Inst., 194 F.3d 547, 555 (4th Cir. 1999).**

Petitioner has not shown that the documents at issue ever existed. Although James McLean testified that FBMC did, at one time, have a copy of a Ginnie Mae application to pool manufactured home loans, Ginnie Mae executive, Sandra Dixon, testified that she had never seen it and there was no such document in FBMC's file at Ginnie Mae.  **Trial Transcript, Vol. V, filed February 18, 2004, at 1221; Trial Transcript, Vol. VI, filed February 18, 2004, at 1642**.

Next, Petitioner has failed to allege that these documents were material to her defense.  The Government established at trial that the defendants created and sold loans for which there were no real borrowers and, except for a few, had no homes as collateral.  **Trial Transcript, Vol. IV, *supra,* at 1073-81.**  However, whether or not the defendants believed they could sell manufactured homes or construction loans was not a defense to selling loans with no true borrower or collateral.  The loans that

were pooled as Ginnie Mae securities and the loans that were funded with BB&T warehouse line did not qualify as FHA single family loans, Title I manufactured housing loans, or construction loans, because they were not, in fact, loans.  The notes sold by FBMC were instead simply paper, with no worth, designed to cover the defendant's scheme to defraud.

Petitioner has not established a *Brady* violation; therefore, she has not established that her counsel was ineffective for failing to raise this issue.

Next, Petitioner complains that the Government improperly argued on appeal that (a) appellants had "built only a dozen homes and sold none," whereas she asserts that they had built about 30 homes and sold at least five, and (b) Eric Brown testified that "[James] McLean explicitly stated that his investor program was not really legal," whereas Eric Brown's full testimony showed that James McLean's statement was "very ambiguous."

A review of these statements shows that none were improper as they were supported by the record and were fair comments on the evidence at trial.  As an example, James McLean admitted on cross-examination that he only built "about 12 houses," but issued over 186 "investor loans."  **Trial Transcript, Vol. V, *supra*, at 132.**  Eric Brown testified that James

McLean told him that the "investor" program "was legal, but [ ] not really legal."  Eric Brown and his father understood the true and "explicit" meaning of these words – *i.e.*, that James McLean and the Zimmermans wanted them to engage in fraud.  Moreover, the Government's argument on appeal that James McLean's words were an "explicit" admission of fraud and could not have been misleading as the witnesses words were quoted from the record of trial.

Therefore, Petitioner has not established her burden and her claims of prosecutorial misconduct fail.  Likewise, Petitioner's counsel was not ineffective for failing to raise these issues on appeal since there was no basis for these claims either in fact or law.

## G. Ineffective Assistance of Counsel Claims Regarding Trial Strategy

Petitioner includes a litany of ineffective assistance of counsel claims regarding counsel's trial strategy.  These claims amount to nothing more than second-guessing a trial strategy, one the Petitioner approved at the time.  Indeed, in her affidavit, Danielle Obiorah states that all arguments made at trial comported with the trial strategy and were discussed with Zimmerman.  **Obiorah Affidavit,** *supra***, ¶¶ 3-7.**  "A decision consistent

with a reasonable trial strategy cannot support a claim of ineffective assistance of counsel." ***Strickland*, 466 U.S. at 689**.

At trial Petitioner's strategy was to convince the jury she was "not involved in the running of FBMC or knowledgeable of the HUD rules and regulations." **Obiorah Affidavit, ¶ 3.** It was a central defense theme throughout the trial and on appeal that neither Zimmerman nor her husband "understood how the mortgage transactions worked such that they would know the transactions were improper" or that the mortgages were being submitted to "quasi-governmental bodies." ***McLean*, 131 F. App'x at 39.** Thus, as counsel indicates in her affidavit, it was not part of the defense strategy to introduce documents such as FBMC's annual recertification forms or to call witnesses such as Keith Jeffries or Mike Garcia. ***See* Obiorah Affidavit, ¶¶ 3, 4, 6**. Such testimony and evidence would only have suggested that Zimmerman did have knowledge of the scheme and how it worked inside FBMC. It would also have been inconsistent with the Zimmerman's purported "reliance" on James McLean's interpretation of Fannie Mae and Ginnie Mae rules and policies.

First, Petitioner contends that her counsel failed to present FBMC's HUD application and approval to issue Title I manufactured home loan

guarantees. James McLean stated on direct examination that he submitted a Title I application to Ginnie Mae that allowed "me to do manufactured housing, modular homes, mobile homes, home only and homes without land." **Trial Transcript, Vol. V, *supra*, at 1221.** However, he also admitted that he did not have a copy of the application. ***Id.* at 1305-06.** Further, Ginnie Mae account executive Sandra Dixon testified on rebuttal that she had examined FBMC's issuer file and there was no such application in the file. **Trial Transcript, Vol. VI, *supra*, at 1642.** Petitioner's counsel cannot be deficient for failing to move to introduce a document that did not exist. Petitioner has not established that her attorney's performance was deficient.

Next, Petitioner claims her counsel was ineffective for failing to impeach former FBMC underwriter and co-defendant Richiedean Gess. A review of Gess' testimony on direct examination establishes that she learned about FBH at a Christmas party in 1997 when Petitioner introduced herself as the vice-president of FHB and said that FHB would be building houses. **Trial Transcript, Vol. III, filed February 18, 2004, at 585-86.** The remainder of her testimony focused on FBMC and FHA loan procedures. Petitioner's counsel cross-examined Gess on her knowledge

of Petitioner's role at FBH.  She also established through Gess that Petitioner did not have an office at FBMC and Gess never discussed her concerns about the legality of FBMC's "investor program" with Petitioner. *Id.*  Further, Petitioner's counsel attempted to impeach Gess with her prior grand jury testimony and her plea agreement with the Government.  *Id.* **at 641-43**.

This review of the trial proceedings reveals that Petitioner's counsel did attempt to establish testimony *via* Gess that was helpful to Petitioner's defense and to impeach Gess on points that would show her bias against the defendants.  There was no reason for Petitioner's counsel to cross-examine Gess on whether someone else "consulted" her on how to underwrite loans.  This was co-defendant James McLean's defense, not Petitioner's.

Petitioner next contends that her counsel was ineffective for failing to rebut Ginnie Mae employee Sandra Dixon's testimony with an FBMC annual approval recertification form.  Once again, a review of the record reveals that Petitioner suffered no prejudice from her counsel's alleged failure.  Indeed, Sandra Dixon testified on rebuttal for the Government that the "mobile" and "manufactured housing" blocks on FBMC's application to

become a Ginnie Mae issuer were not checked, she never told James McLean that it was permissible to pool manufactured home loans and that Ginnie Mae last accepted such loans in the mid-1980's.  **Trial Transcript, Vol. VI,** *supra***, at 1641-43.**  On redirect, the Government showed Dixon FBMC's annual verification reports for 1997 and 1998, which had previously been admitted into evidence as James McLean's Exhibits 1 and 2.  *Id.*  Dixon testified that these were not Ginnie Mae forms.  *Id.*  It is clear that Petitioner's counsel had nothing to gain from further cross-examination of Dixon, but such would have drawn the jury's attention to Petitioner's connections with FBMC.  Petitioner has not established deficiency or prejudice as is required by *Strickland*.

Next, Petitioner contends that her counsel was ineffective for failing to impeach Sandra Dixon with the out-of-court statement of Ginnie Mae employee Mike Garcia that manufactured housing loans could be pooled "so long as those homes are stick built and are permanent," and to call Mike Garcia as a defense witness at trial.  Here, once again, Petitioner cannot establish either prong of the *Strickland* test.  Mike Garcia, a Ginnie May account executive, told FBI agents in a telephonic interview that he recalled being asked by other Ginnie Mae employees, including Ingrid

Ripley, about the appropriateness of placing manufactured housing loans into single family mortgage pools. Garcia told the FBI agents that such homes could be placed in a Ginnie Mae pool only if they were "stick-built and are permanent." Ingrid Ripley testified on rebuttal that her notes reflect a call from James McLean on May 11, 2000, in which he asked a similar question about manufactured housing loans. **Trial Transcript, Vol. VI, *supra*, at 1647**. Ripley testified that she told James McLean that the loans would have to be approved as FHA Title I for at least two years or, if pooled, as FHA Title II loans – which are single family residences – the property had to be deeded with the structure and land. *Id.* **at 1648.** Since Ripley testified to essentially the same information from Garcia, the failure to use Garcia's statements did not prejudice Petitioner. Moreover, James McLean admitted in his testimony that of the 186 loans FBMC placed in Ginnie Mae pools by 2000, FBH had only finished two houses and had twelve under construction. **Trial Transcript, Vol. V, *supra,* at 1327-28**. Thus, Mike Garcia's testimony would have served to highlight the fact that the Zimmermans collected and were paid for more than 100 counterfeit notes when they built very few homes. Moreover, Mike Garcia would have damaged James McLean's credibility, on whom the

Zimmermans claimed they relied, in that none of the loans pooled by

FBMC qualified as manufactured home loans even if they had been

authorized.

Petitioner also alleges that her attorney was ineffective for failing to

call Mike Garcia to testify regarding the statement he made about the

appropriateness of placing manufactured home loans into Ginnie Mae

single family pools.  Petitioner claims that this testimony could have

negated the Government's incorrect allegations that FBMC was not

authorized to do manufactured home loans.  However, this testimony

would not have supported Petitioner's defense which was that she relied

on James McLean's expertise in the mortgage industry.  The evidence at

trial showed that James McLean was the only defendant to have direct

contact with Ginnie Mae.  Whether James McLean was right or wrong

about the ability to pool manufactured housing loans was not relevant to

Petitioner's defense.  Calling Mike Garcia as a witness would not have

advanced Petitioner's trial strategy.  Therefore, Petitioner has not

established that her counsel was deficient for not calling Garcia as a

witness, nor has she established prejudice.

As her next claim, Petitioner contends that her counsel was ineffective for failing to impeach and rebut the testimony of Eric Brown with specific facts.   Eric Brown testified on direct examination that he and his father met with Debbie and Paul Zimmerman and James McLean to discuss FBMC's financing for building a residential development of a track of land owned by their family.  **Trial Transcript, Vol. IV, *supra*, at 861-63**. When presented with completed mortgage loan notes in the names of his family members by Debbie Zimmerman, Mr. Brown and his father refused to sign until they could show the documents to their attorney.  ***Id.* at 868.** Zimmerman would not permit Eric Brown to leave the premises with the completed loan agreements.  ***Id.* at 869-70.**  When James McLean arrived at the meeting, he also said the notes could not leave the office, followed by, "Look, this – this is legal, but it's not really legal."  ***Id.* at 871.**

On cross-examination, Petitioner's counsel established through Woodrow Moore, Eric Brown's father, that Petitioner was present at only one of the three meetings he had with James McLean.  **Trial Transcript, Vol. III, *supra*, at 855-56.**  Counsel also cross-examined Eric Brown and attempted to show that her client may not have been present when James McLean made the statement about the scheme not being legal.  Counsel

asked Mr. Brown whether he recalled telling the FBI that Debbie

Zimmerman was not present when James McLean made this particular

statement.  *Id.* **at 880-84**.[6]

The trial transcript establishes that Petitioner's counsel attempted to

impeach both Woodrow Moore and Eric Brown with inconsistencies

between their trial testimony and pretrial statements to investigators.  *Id.* **at**

**856-57; 882-83.**  The Court concludes that Petitioner has not established

either prejudice or deficiency with respect to this claim.

In a related claim, Petitioner contends that her counsel was

ineffective for failing to request "an evidence hearing" in order to have the

testimony of Eric Brown and Woodrow Moore "suppressed."

Once again, the trial strategy was to put as much distance between

Petitioner and FBMC's loan operations as possible.  Any objection to this

testimony would likely not have served counsel's trial strategy and may

have led to more questions regarding Petitioner's knowledge of how the

fraudulent loans were processed.  Further, it is unlikely the Court would

have sustained any such objection.  Indeed, the testimony of Eric Brown

---

[6] Brown testified that he may have made this statement to the FBI,
but he simply did not remember at the time he was testifying.  **Trial
Transcript, Vol. IV,** *supra***, at 882-84.**

and Woodrow Moore concerned transactions that occurred during the alleged conspiracy and involved the same scheme to defraud. The evidence was admissible even though the acts involving Mooreland Estates were not specifically alleged in the indictment because the witnesses' testimony showed the existence of a conspiratorial agreement between the defendants and described additional overt acts that occurred in furtherance of the conspiracy charged in Count One. Moreover, the evidence was admissible as uncharged conduct because it was offered to show the defendants' knowledge that their acts were illegal and demonstrated a pattern of conduct similar to that charged in the indictment. Further, "'[e]vidence of other crimes, wrongs, or acts' that is not intrinsic to the crime may still be admissible if it demonstrates 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" **United States v. Higgs, 353 F.3d 281, 311 (4th Cir. 2003) (quoting United States v. Young, 248 F.3d 260, 271-72 (4th Cir. 2001)); Fed. R. Crim. P. 404(b)**.

Petitioner has not established that her counsel was deficient under the *Strickland* test and in any event, cannot establish prejudice as she would not have prevailed even if counsel had objected.

Next, Petitioner contends that her counsel was ineffective for failing to call Keith Jeffries as a defense witness. In response to this claim, counsel states that she and Zimmerman discussed all witnesses that would and would not be called to testify and decided only those witnesses whose testimony was consistent with Petitioner's trial strategy would be called to testify. **Obiorah Affidavit,** *supra***, ¶ 7**. Counsel was aware of the memorandum of Keith Jeffries' interview, which was provided in discovery, that he was an underwriter employed by FBMC who had little or no contact with the Zimmermans.[7] ***See*** **Exhibit 19, 12/10/00 Memorandum of Interview,** *attached to* **Respondent's Answer.** Petitioner has not established how counsel's decision not to call Jeffries as a witness was deficient or how she was prejudiced by this decision. Therefore, she has not established either prong of the *Strickland* test and this claim must fail.

Petitioner also contends that her counsel was ineffective for failing to subpoena evidence from Ginnie Mae. Petitioner's counsel stated in her affidavit that this claim is too vague to address. Indeed, the Court agrees. Petitioner's claim is that her counsel was ineffective for failing to subpoena

---

[7] The only mention of the Zimmermans in the Jeffries' interview was a hearsay statement by James McLean that the Zimmermans were incompetent employees. *Id.*

unspecified evidence from Ginnie Mae that could have proven that "Movant acted in good faith and could have negated the mis-impression of the government's evidence at trial." **Motion to Vacate, at 39.**

This theory is consistent with James McLean's defense and not Petitioner's trial strategy. James McLean states in an affidavit submitted with Petitioner's motion that "Macy W. McLean, Paul Zimmerman and Debbie Zimmerman . . . had no knowledge as to the legality of the 'Investor program,' as well as whether or not [FBMC] was authorized to do 'manufactured home loans' under the [T]itle I or [T]itle II/ [G]innie [M]ae single family program." **Affidavit of James E. McLean, Jr., *attached to* Petitioner's Response, ¶ 4**. He further states that it was his "sole" decision to do manufactured home loans. *Id.* Therefore, if Petitioner had no knowledge of the legality of the program and James McLean was solely responsible, then any evidence from Ginnie Mae or HUD would not be material to Petitioner's defense. Furthermore, the Government was not required to prove that Petitioner knew all the details of the mortgage loan scheme or even how it worked. Instead, the Government was required to and did prove that Petitioner knew the illegal objects of and willfully joined the conspiracy. With respect to Counts 47, 51 and 52, the Government

need only prove that the defendants "knew that the mortgage notes were actually false or counterfeited" and that they would be offered for some purpose to HUD. **McLean, 131 F. App'x at 40 (citations omitted)**. Additional documents from Ginnie Mae or HUD would not have changed the outcome of the trial. Petitioner has not established deficiency or prejudice as to this claim and it must fail.

## H. Ineffective Assistance on Appeal

Petitioner alleges that her counsel was ineffective for failing to raise constructive amendment, defective amendment, multiplicity, duplicity and prosecutorial misconduct on appeal. As stated *infra*, these claims are without legal foundation. Therefore, raising them on appeal would have been frivolous. Indeed, appellate counsel is permitted wide latitude in determining which claims are most likely to succeed on appeal and are, therefore, worth bringing. **Jones v. Barnes, 463 U.S. 745, 751-54 (1983); Fisher v. Lee, 215 F.3d 438, 457 (4ᵗʰ Cir. 2000).** Further, counsel is not required to assert all non-frivolous issues on appeal. **Jones, 463 U.S. at 751-52.** Petitioner has not established that her appellate counsel was ineffective, therefore, this claim must fail.

## IV. CONCLUSION

Petitioner has presented a laundry list of alleged errors at trial and on appeal which she alleges constituted ineffective assistance of counsel. The Court's review of the record demonstrates that Petitioner's counsel was both zealous and competent at all stages of Petitioner's case. To the extent Petitioner's counsel was in any way deficient, Petitioner has not established the prejudice as required by *Strickland*. Consequently, all of Petitioner's ineffective assistance of counsel claims must fail.

## V. ORDER

**IT IS, THEREFORE, ORDERED** that the Respondent's motion for summary judgment is **ALLOWED**, the Petitioner's motion to vacate, set aside or correct sentence pursuant 28 U.S.C. § 2255 is **DENIED.** A Judgment dismissing this action is filed herewith.

Signed: August 26, 2009

Lacy H. Thornburg
United States District Judge